FILED

JAN 23 2024

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | INDICTMENT |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | CASE NO. _____ |
| ZUBAIR MEHMET ABDUR RAZZAQ AL ) | 1:24 CR 00017 |
| ZUBAIR, ) | Title 18, United States Code, |
| aka ZUBAIR MEHMET ABDUR ) | Sections 641, 1071, 1343, 1349, |
| RAZZAQ, ) | 1956(h), 1957, and 2 |
| MUZZAMMIL MUHAMMAD AL ) | JUDGE FLEMING |
| ZUBAIR, ) | |
| aka MUZZAMMIL IBN MUHAMMAD, ) | |
| ) | |
| Defendants. ) | |
| ) | |

<u>General Allegations</u>

At all times material to this Indictment, unless otherwise specified:

***The Defendants and Relevant Businesses***

1.      Defendant ZUBAIR MEHMET ABDUR RAZZAQ AL ZUBAIR, aka ZUBAIR

MEHMET ABDUR RAZZAQ (hereinafter "ZUBAIR AL ZUBAIR"), was born in Cleveland,

Ohio.  From approximately 2008 to 2020, ZUBAIR AL ZUBAIR resided in the United Arab

Emirates ("U.A.E.").  In approximately 2020, ZUBAIR AL ZUBAIR moved to the Cleveland,

Ohio area and has resided in the Northern District of Ohio ever since.  Despite having no familial

relationships with any member of royal families in the U.A.E. or any other country, ZUBAIR AL

ZUBAIR falsely claimed to be a member of a royal family in the U.A.E., and often using the

honorific "His Excellency" or "H.E." in correspondence.  He also falsely claimed that he had

married a "princess" from a royal family in the U.A.E.  ZUBAIR AL ZUBAIR frequently made

1

false claims that his family had extensive business operations and was extraordinarily wealthy. ZUBAIR also falsely claimed to have personal or family connections with the rulers and governments of multiple foreign countries.

2.  Defendant MUZZAMMIL MUHAMMAD AL ZUBAIR, aka MUZZAMMIL IBN MUHAMMAD (hereinafter "MUZZAMMIL AL ZUBAIR"), was born in Cleveland, Ohio, and was a resident of the Cleveland, Ohio area in the Northern District of Ohio.  MUZZAMMIL AL ZUBAIR claimed to be a hedge fund manager.  MUZZAMMIL AL ZUBAIR was not registered as an Investment Adviser with the Securities and Exchange Commission or as a broker with the Financial Industry Regulatory Authority ("FINRA").  MUZZAMMIL AL ZUBAIR's only education on hedge funds was from watching YouTube videos.  MUZZAMIL AL ZUBAIR and ZUBAIR AL ZUBAIR were brothers.

3.  Dubai Bridge Investments was a business operated by ZUBAIR AL ZUBAIR and MUZZAMMIL AL ZUBAIR.  According to records on file with the Ohio Secretary of State, Dubai Bridge Investments, LLC (hereinafter "Dubai Bridge Investments") was an active foreign limited liability company doing business in Ohio as of December 22, 2020.  The agent/registrant was listed as MUZZAMMIL AL ZUBAIR.  According to Delaware business record filings, Dubai Bridge Investments was incorporated in Delaware on December 16, 2013, as a limited liability company.  According to an application with the Small Business Administration, ZUBAIR AL ZUBAIR owned 51% and MUZZAMMIL AL ZUBAIR owned 49% of Dubai Bridge Investments.  According to its webpage, Dubai Bridge Investments claimed to be "[a]n innovative hybrid of private equity and venture capital."  The website claimed the company was "headquartered in both Dubai and North America," and "focus[ed] on key areas such as energy and mining, food and beverage, transportation, consumer product distribution, and technology."

The website identified ZUBAIR AL ZUBAIR as its chairperson and MUZZAMMIL AL ZUBAIR as managing partner. ZUBAIR AL ZUBAIR's biography on the website claimed that he "has created successful ventures by building relationships throughout the business and political worlds." MUZZAMMIL AL ZUBAIR's biography on the website claimed that he "founded the family's vast capital market's arm as well as spearheads the family's financial operations and mergers and acquisitions." Dubai Bridge Investments maintained multiple bank accounts, including accounts at JP Morgan Chase ending in 0302 and 0079 and an account at PNC Bank ending in 2216. ZUBAIR AL ZUBAIR and MUZZAMMIL AL ZUBAIR were authorized signatories on these accounts.

4.      Al Zubair Capital was a business operated by ZUBAIR AL ZUBAIR and MUZZAMMIL AL ZUBAIR. On May 16, 2020, Al Zubair Capital LTD (hereinafter "Al Zubair Capital") was registered with the Ohio Secretary of State as a foreign for-profit limited liability company. The registered agent was MUZZAMMIL AL ZUBAIR. The company was originally incorporated in Delaware on May 6, 2020, as Al Zubair Capital LLC. Al Zubair Capital maintained a bank account with JP Morgan Chase ending in 9283. ZUBAIR AL ZUBAIR and MUZZAMMIL AL ZUBAIR were authorized signatories for the account. Al Zubair Capital maintained an account with TD Ameritrade, an online brokerage service. MUZZAMMIL AL ZUBAIR signed and submitted the application to set up this account and was the authorized user.

### Cryptocurrency Mining

5.      Cryptocurrency mining was the process by which computers solve a complicated mathematical equation in order to validate cryptocurrency transactions and earn new cryptocurrency. Cryptocurrency mining required a large amount of computing power, often utilizing hundreds or thousands of individual mining computer terminals known as "miners."

These miners were often operated together within a larger container, similar to an industrial shipping container. One brand name for these containers was "Antbox." A cryptocurrency mining operation could use thousands of miners housed in hundreds of containers.

6.      To be profitable, cryptocurrency mining operations required a great deal of inexpensive electricity and a large amount of available space, such as large warehouses or industrial parks. Miners gave off a great deal of heat, requiring noisy industrial cooling. Because of the generated heat, mining operations operated most efficiently in cooler climates. Former industrial sites in the United States were considered to be suitable prospective locations for cryptocurrency mining.

### Nela Park

7.      Nela Park was located in East Cleveland, Ohio. Nela Park, named after the National Electric Lamp Association, was one of the first industrial parks in the United States when it was built in approximately 1913. General Electric owned and operated Nela Park for many years. In 2021, Nela Park was owned by GE Lighting, which had previously been a division of General Electric. In 2021, the property was for sale by GE Lighting. The property was sold to Phoenix Investors in the spring of 2022. At no time did ZUBAIR, MUZZAMMIL, any member of their family, or any business they own have ownership, control, or any possessory interest over or in Nela Park or any of its land or buildings.

### The Small Business Administration's Economic Injury Disaster Loan Program

8.      The United States Small Business Administration ("SBA") was an executive branch agency of the United States government. The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small business and to assist in the economic recovery of communities after disasters.

9.      The Coronavirus Aid, Relief and Economic Security ("CARES") Act was a federal law enacted in or around March 2020 and was designed to provide emergency financial assistance to Americans suffering the economic effects caused by the COVID-19 pandemic.  One source of relief under the CARES Act was authorization of the SBA to issue loans to small businesses and non-profit entities experiencing revenue loss due to the pandemic.

10.     One form of such assistance was the Economic Injury Disaster Loan ("EIDL") program, which provided loan assistance for certain businesses negatively affected by the COVID-19 pandemic.  To qualify for an EIDL loan, a business must have, among other requirements, suffered working capital losses due to the COVID-19 pandemic.

11.     Applicants for EIDL loans used the SBA online portal to submit their application materials.  The servers that processed the EIDL loan applications were based in the state of Iowa.

12.     Applicants had to certify that the information in the application was true and correct, under the penalty of perjury and applicable statutes.  The application process involved filling out data fields relating to the size and ownership of the affected business entity, and other information about the relevant business for the 12 months prior to COVID-19 impacting the national economy, such as the number of employees in the business, the gross business revenues realized, and the cost of goods sold.  This information, submitted by the applicant, was then used by SBA systems to determine whether the application would be approved, and to calculate the amount of money the applicant was eligible to receive.

13.     Pursuant to the provision governing the EIDL program, loan proceeds could only be used by the affected business receiving EIDL loans for certain permissible expenses.  The loans could be used by the business to pay fixed debts, payroll, accounts payable, and other bills that could have been paid had the COVID-19 disaster not occurred.  The applicant was required

5

to promise in the Loan Authorization and Agreement that the EIDL funds would be used solely as working capital to alleviate economic injury caused by the COVID-19 disaster.

*Victims*

14.     Victim 1, a person known to the Grand Jury, was a resident of the U.A.E. who had a personal, romantic relationship with ZUBAIR AL ZUBAIR.

15.     Victim 2, a person known to the Grand Jury, was a Chinese national involved in the business of cryptocurrency mining in China.  After China banned cryptocurrency mining in approximately 2021, Victim 2 traveled to the United States to attempt to continue cryptocurrency mining.  While in the United States, Victim 2 scouted potential locations for cryptocurrency mining. Victim 2 operated a cryptocurrency mining company (hereinafter "Cryptocurrency Mining Company 1").  ZUBAIR AL ZUBAIR developed a close, personal relationship with Victim 2 that Victim 2 believed was romantic in nature.

16.     Victim Company 1, a company known to the Grand Jury, was the owner of a commercial property in Cleveland, Ohio.

17.     Victim 3, a person known to the Grand Jury, was the owner of a residence in Bratenahl, Ohio.

*Additional Relevant Entities and Individuals*

18.     Individual 1, a person known to the Grand Jury, was an associate of both ZUBAIR AL ZUBAIR and Victim 2 who lived in Cleveland, Ohio.

19.     Realtor 1, a person known to the Grand Jury, was a realtor in Cleveland, Ohio, who was hired by ZUBAIR AL ZUBAIR to represent him on proposed real estate transactions.

20.     Canadian Company 1 was a consulting business which purchased and resold cryptocurrency mining contracts and equipment.

<u>COUNT 1</u>
(Conspiracy to Commit Wire Fraud, 18 U.S.C. § 1349)

The Grand Jury charges:

21.     Paragraphs 1 through 20 of the Indictment are re-alleged and incorporated by reference as if fully set forth herein.

22.     From in or around June 2020 to in or around August 2023, in the Northern District of Ohio, Eastern Division and elsewhere, Defendants ZUBAIR MEHMET ABDUR RAZZAQ AL ZUBAIR, aka ZUBAIR MEHMET ABDUR RAZZAQ, and MUZZAMMIL MUHAMMAD AL ZUBAIR, aka MUZZAMMIL IBN MUHAMMAD, and others known and unknown to the Grand Jury, did knowingly combine, conspire, confederate, and agree to devise and intend to devise schemes and artifices to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such schemes and artifices, and attempting to do so, to transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, certain writings, signals, signs, pictures and sounds: that is, to knowingly make and cause to be made interstate wire communications in furtherance of said schemes and artifices to defraud, in violation of Title 18, United States Code, Section 1343.

**Object of the Conspiracy**

23.     It was the object of the conspiracy for Defendants to enrich themselves by using multiple schemes to obtain funds, goods and property under false pretenses to use for their own personal benefit.

**Manner and Means of the Conspiracy**

It was part of the conspiracy that:

24.     Defendants created the illusion that they were sophisticated and wealthy investors

with important political, business, and family connections who operated successful investment businesses to lure potential victims into investing funds with them or engaging in other financial transactions.

25.     Defendants used false statements and claims about their wealth, business connections, familial connections, political connections, foreign connections, experience, and property ownership to convince victims to provide them with access to funds, real property, and goods that they could then exploit to their own benefit.

26.     Defendants promised large and extraordinary returns and payments to victims.

27.     Defendants altered bank and investment account statements to show that they had greater funds than they had in order to convince victims of their financial resources and to provide false documentation of the status of victims' investments.

28.     Defendants utilized interstate wire communications and money transfers in furtherance of their scheme.

29.     Defendants used their businesses, Dubai Bridge Investments and Al Zubair Capital, in furtherance of their schemes to create a false illusion of prosperity and success and as vehicles for receiving and transferring the proceeds of their scheme.

30.     Defendants shared in the proceeds of their schemes, which they spent on luxury vehicles, travel on private jets, luxury travel, lavish hotel stays, entertainment, shopping, jewelry, firearms, and other luxury items.

31.     Defendants used multiple bank accounts and made multiple financial transactions with the proceeds of their schemes to conceal the source of the funds.

32.     When victims complained about having lost money to Defendants, Defendants made limited payments to them to attempt to quiet them, before entirely ceasing all

communications.

33.     Defendants followed a pattern of using schemes to obtain funds from one victim, exhausting those funds, and then obtaining funds from a new victim.

34.     ZUBAIR AL ZUBAIR established controlling, romantic relationships with victims, which made it less likely that they would challenge or question his actions.

35.     Defendants executed and attempted to execute a series of schemes as part of the conspiracy, including but not limited to:

### *U.A.E. Investor Scheme*

36.     Defendants defrauded Victim 1 of funds in a fraudulent investment scheme. Starting in June 2020, Defendants obtained a series of wire transfers from Victim 1, who was in the U.A.E. and was involved in a romantic relationship with ZUBAIR AL ZUBAIR.  These wire transfers were for investments on behalf of Victim 1.  All of the funds provided by Victim 1 in the first wire transfer were invested in the Al Zubair Capital TD Ameritrade account. As Victim 1 sent further payments, a smaller percentage of the funds was invested in the Al Zubair Capital TD Ameritrade account.  The uninvested funds were used for the personal benefit of Defendants, while the funds that were invested were eventually either lost or transferred to accounts controlled by Defendants and used for their own personal benefit.  In order to maintain the appearance that Defendants were investing Victim 1's funds in a successful investment account, ZUBAIR AL ZUBAIR emailed Victim 1 altered TD Ameritrade account statements that greatly inflated the amounts and profits generated in the account, when compared to the actual status of the account.

37.     On or about April 1, 2021, ZUBAIR AL ZUBAIR sent Victim 1 an email falsely promising extraordinarily high returns to invest in an oilfield company.  Victim 1 then wire

9

transferred $450,000 to Defendants. Defendants did not spend any of these funds on an oilfield company investment. Instead, Defendants invested a portion in the Al Zubair Capital TD Ameritrade account and spent the rest for their own personal benefit. In all, Victim 1 sent Defendants $860,875.46. Defendants sent Victim 1 only a small percentage of the amount invested back to her in a series of wire transfers. The funds that were invested in the TD Ameritrade account eventually were either lost in unprofitable investments or transferred to bank accounts controlled by Defendants. ZUBAIR ignored Victim 1's repeated inquiries and complaints about the status of her investment.

### *SBA EIDL Scheme*

38.     In or around February and March 2021, Defendants fraudulently applied for and obtained $27,400 from the SBA EIDL program. MUZZAMMIL AL ZUBAIR caused an electronic application for EIDL funds to be submitted on behalf of Dubai Bridge Investments. The application claimed that Dubai Bridge Investments was in the restaurant business even though the business claimed to be an investment company and did not own any restaurants. The loan agreement form was signed by MUZZAMMIL AL ZUBAIR on behalf of Dubai Bridge Investments. According to the terms of the loan, Dubai Bridge Investments was required to "use all the proceeds of this loan solely as working capital to alleviate economic injury caused by disaster."

39.     Defendants created a new bank account for Dubai Bridge Investments, the PNC Bank account ending in 2216, on or about February 8, 2021. This account received the proceeds of the loan on March 9, 2021. All of the proceeds were spent by the end of March 2021. Instead of spending the funds on authorized expenses, the funds were primarily spent on personal expenses unrelated to operating Dubai Bridge Investments, including $2,183 on airline tickets,

$1,183.68 at a fashion clothing company, $4,000 at a high-end hotel in Cleveland, multiple restaurant purchases, purchases at the Cleveland Aquarium, and 14 ATM withdrawals totaling over $6,000.

### *Nela Park Cryptocurrency Mining Scheme*

40.     Between in or around July 2021 and in or around May 2022, Defendants defrauded Victim 1 out of more than $3,000,000 and cryptocurrency mining equipment worth at least $6,000,000 related to a fraudulent scheme to start a cryptocurrency mining operation at Nela Park. Defendants convinced Victim 2 to invest in a proposed cryptocurrency mining project at Nela Park by falsely claiming that they controlled Nela Park and could obtain large amounts of electrical power at a cheap cost. Based on these representations from Defendants, on or about August 11, 2021, Victim 2 signed a contract with Dubai Bridge Investments to set up cryptocurrency mining at Nela Park in which Victim 2 agreed to pay $3,000,000 to Dubai Bridge Investments in a series of payments. The first $1,000,000 was due upon signing, and the other $2,000,000 was due when certain benchmarks were met. Victim 2 paid the first $1,000,000 after signing the contract. Despite not actually owning or controlling Nela Park in any way, ZUBAIR AL ZUBAIR requested early payment of the $2,000,000 from Victim 2 by falsely claiming that the money was needed to pay for upgrades to Nela Park. After Victim 2 provided the funds in September 2022, Defendants spent most of the funds on personal items and did not use it for upgrades to Nela Park.

41.     Victim 2 arranged for the shipment of hundreds of containers and thousands of miners from China to Nela Park. Because Defendants did not actually own Nela Park, they falsely informed Victim 2 that there was a mercury contamination problem at Nela Park that prevented them from shipping the containers and miners there. Later, when Victim 2 saw a news

report that Nela Park had been sold to Phoenix Investors, and not to Defendants, ZUBAIR AL ZUBAIR claimed the reason was the mercury contamination.

42.     In the spring of 2022, after Victim 2 complained about the status of the Nela Park cryptocurrency mining project, ZUBAIR made a new agreement with Victim 2 in which he claimed his family would pay Victim 2 $33,000,000 to invest in the cryptocurrency mining project.  ZUBAIR AL ZUBAIR then told Victim 2 that in order to send the funds to her bank account, they needed a series of smaller transactions to establish a history between the accounts. As a result, ZUBAIR AL ZUBAIR requested that Victim 2 send several wire transfers totaling $160,000 to his personal bank account.

43.     In March and April 2022, ZUBAIR AL ZUBAIR told Victim 2 that they needed to display the mining computers for political officials and the bank in order to get the $33,000,000 payment he had promised.  Victim 2 agreed to temporarily display the miners.  She gave access to the storage facility where the miners were stored to MUZZAMMIL AL ZUBAIR. MUZZAMMIL AL ZUBAIR took 1,067 miners from the storage facility.   Instead of displaying the miners, Defendants sold them to a Canadian company for over $6,000,000 without Victim 2's permission.  After Victim 2 repeatedly asked ZUBAIR about the status of the miners that were taken for display and demanded the $33,000,000 that ZUBAIR had promised, Defendants made a series of smaller payments totaling $800,000 to Victim 2 from the proceeds.  Defendants never returned the miners.  Defendants also sold some of the Ant Box containers without Victim 2's knowledge or permission and kept the proceeds.

### Commercial Property Lease Scheme

44.     In February 2022, Defendants used falsified financial documentation to attempt to obtain a lease for commercial property owned by Victim Company 1 in Cleveland, Ohio, for the

stated purpose of opening a high-end restaurant.  In order to obtain the lease, Defendants were required to provide proof of their financial resources to the lessor, Victim Company 1. Defendants provided a TD Ameritrade account statement that MUZZAMMIL AL ZUBAIR had altered to show that they had significantly more funds than they did in reality in an attempt to prove that they had sufficient financial resources to make lease payments.

### *Residential Property Lease Scheme*

45.     In March 2022, ZUBAIR AL ZUBAIR used falsified financial documentation to obtain the lease to a high-end residential property in Bratenahl, Ohio, owned by Victim 3.  When asked to provide proof of financial resources, ZUBAIR AL ZUBAIR provided a bank statement that MUZZAMMIL AL ZUBAIR had altered and caused to be altered to show that he had far greater funds in his account than he had in reality. Victim 3 leased the residence to ZUBAIR AL ZUBAIR, who paid the rent for the first year with proceeds from the Defendants schemes.  After renewing the lease for another year, ZUBAIR AL ZUBAIR stopped paying rent and caused and allowed to be caused significant property damage before being evicted in August 2023.

### <u>Acts in Furtherance of the Conspiracy</u>

In furtherance of the conspiracy, and to effect the objects and conceal the existence thereof, Defendants and others performed acts in the Northern District of Ohio and elsewhere, including, but not limited to, the following:

### *U.A.E. Investor Scheme*

46.     On or about May 27, 2020, MUZZAMMIL AL ZUBAIR opened a bank account for Al Zubair Capital ending in 9283 at JP Morgan Chase Bank.

47.     On or about June 24, 2020, ZUBAIR AL ZUBAIR and MUZZAMMIL AL ZUBAIR caused Victim 1 to wire transfer $18,500 to the Al Zubair Capital bank account ending

in 9283. The wire transfer referenced "Commercial Investments."

48. On or about September 8, 2020, ZUBAIR AL ZUBAIR and MUZZAMMIL AL ZUBAIR caused Victim 1 to wire transfer $67,862.86 and $58,550 to the Al Zubair Capital bank account ending in 9283. The wire transfers referenced "Commercial Investments."

49. On or about November 17, 2020, ZUBAIR AL ZUBAIR emailed Victim 1 a copy of a TD Ameritrade account statement for Al Zubair Capital that had been altered to show greater amounts than were actually in the account.

50. On or about November 27, 2020, ZUBAIR AL ZUBAIR and MUZZAMMIL AL ZUBAIR caused Victim 1 to wire transfer $65,000, $65,000, $54,400, and $27,200 to the Al Zubair Capital bank account ending in 9283. The wire transfer referenced "ETFS Penn."

51. On or about January 28, 2021, ZUBAIR AL ZUBAIR and MUZZAMMIL AL ZUBAIR caused Victim 1 to wire transfer $54,362.60 to the Al Zubair Capital bank account ending in 9283. The wire transfer referenced "Commercial Investments."

52. On or about February 5, 2021, ZUBAIR AL ZUBAIR emailed Victim 1 a copy of a TD Ameritrade account statement for Al Zubair Capital that had been altered to show greater amounts than were actually in the account.

53. On or about April 1, 2021, ZUBAIR AL ZUBAIR sent Victim 1 an email in which he sought an investment of approximately $3,000,000 to $4,000,000 by Victim 1 and her family, in which he promised, "The 4mm [$4,000,000] will be covered by a bank guarantee and a q1 [first quarter] net profit north of 120% roi [return on investment]." He also represented that "by year end—your looking at an appreciation of approximately 9mm usd [$9,000,000] 4mm's [$4,000,000] or in our (beginners case)—3mm usd [$3,000,000] at a 500k [$500,000] placement."

54.     On or about April 1, 2021, ZUBAIR AL ZUBAIR emailed Victim 1 a copy of a TD Ameritrade account statement for Al Zubair Capital that had been altered to show greater amounts than were actually in the account.

55.     On or about April 12, 2021, ZUBAIR AL ZUBAIR and MUZZAMMIL AL ZUBAIR caused Victim 1 to wire transfer $450,000 to the Al Zubair Capital bank account ending in 9283.  The wire transfer referenced "Investment."

56.     On or about May 6, 2021, ZUBAIR AL ZUBAIR emailed Victim 1 a copy of a TD Ameritrade account statement for Al Zubair Capital that had been altered to show greater amounts than were actually in the account.

57.     On or about August 8, 2021, ZUBAIR AL ZUBAIR emailed Victim 1 a copy of a TD Ameritrade account statement for Al Zubair Capital that had been altered to show greater amounts than were actually in the account.

### SBA EIDL Scheme

58.     On or about February 8, 2021, ZUBAIR AL ZUBAIR and MUZZAMMIL AL ZUBAIR opened a bank account for Dubai Bridge Investments at PNC Bank ending in 2216.

59.     On or about February 19, 2021, MUZZAMMIL AL ZUBAIR caused to be submitted an online application for a COVID-19 EIDL from the SBA for Dubai Bridge Investments.

60.     On or about March 2, 2021, MUZZAMMIL AL ZUBAIR electronically signed the EIDL Loan Agreement for Dubai Bridge Investments.

61.     On or about March 9, 2021, MUZZAMMIL AL ZUBAIR and ZUBAIR AL ZUBAIR caused $27,400 in EIDL loan proceeds to be transferred to the Dubai Bridge Investments PNC bank account ending in 2216.

### *Nela Park Cryptocurrency Mining Scheme*

62.     In or around July 2021, Defendants paid Individual 1 approximately $50,000 to arrange for an introduction with Victim 2 to discuss a cryptocurrency mining venture at Nela Park.

63.     On or about July 23, 2021, ZUBAIR AL ZUBAIR sent Victim 2 a text message regarding Nela Park that referred to it as "the property we currently control."

64.     On or about July 25, 2021, ZUBAIR AL ZUBAIR sent an email to Victim 2 that was copied to MUZZAMMIL AL ZUBAIR with additional information about Nela Park that referred to it as "our property."

65.     On or about July 25, 2021, ZUBAIR AL ZUBAIR sent another email to Victim 2 that was copied to MUZZAMMIL AL ZUBAIR about Nela Park that said, "There are 30+ buildings under our control and this industrial park."

66.     On or about July 27, 2021, ZUBAIR AL ZUBAIR sent Victim 2 a text message that stated, "We would like to share with you that all electrical power supply and upgrades will be handled and fully provided by us (DBI) as your partner."

67.     On or about July 29, 2021, ZUBAIR AL ZUBAIR and MUZZAMMIL AL ZUBAIR toured Nela Park with Victim 2.

68.     On or about August 5, 2021, ZUBAIR AL ZUBAIR sent an email to Victim 2 that was copied to MUZZAMMIL AL ZUBAIR with a chart claiming that Dubai Bridge Investments could provide electrical power at an initial cost of $0.04 per kilowatt/hour with reductions to even less as the project progressed.

69.     On or about August 10, 2021, MUZZAMMIL AL ZUBAIR sent Victim 2 an email, copied to ZUBAIR AL ZUBAIR, with a proposed contract between Dubai Bridge

Investments and Victim 2 for developing a cryptocurrency mining venture at Nela Park.

70.     On or about August 10, 2021, MUZZAMMIL AL ZUBAIR replied by email, copied to ZUBAIR AL ZUBAIR.  In his reply, MUZZAMMIL AL ZUBAIR did not provide proof of right of possession or ownership to the property at Nela Park or of capacity to obtain electricity at the quoted cost.  Instead he replied: "Since [Cryptocurrency Mining Company 1] isn't taking all the property as once expected or specified if it will be positioning the containers in a specific structure or outdoors, we will proceed in the following way post execution of agreement:  1. Issuing a notarized bill of rights to operate at the address at the specific structure of your choosing.  2. Our agreement with the power source and transmission company covers not only [Cryptocurrency Mining Company 1] but our additional commitments at Nela Park and surrounding area, which we will keep internal.  However, we will commit per the agreement to granting your power at cost.  I believe Zubair previously discussed this with [Victim 2]."

71.     On or about August 11, 2021, ZUBAIR AL ZUBAIR and MUZZAMMIL AL ZUBAIR attended a signing ceremony for a contract between Dubai Bridge Investments and Victim 2 at the East Cleveland Mayor's Office that was attended by Victim 2, Individual 1, the East Cleveland Mayor, his chief of staff, his law director, and others.

72.     On or about August 11, 2021, ZUBAIR AL ZUBAIR, on behalf of Dubai Bridge Investments, and Victim 2 signed a contract for development of cryptocurrency mining at Nela Park.  The contract included the following provisions, each representation constituting an act in furtherance of the scheme:

        a.      Defendants caused Victim 2 to agree to pay Dubai Bridge Investments a
        total of $3,000,000.  The first $1,000,000 was "due at signing of this agreement," the
        second $1,000,000 "upon activtion of the initial 48 mining machines," and the final

$1,000,000 "upon activation of the following 100 megawatts."

        b.      Dubai Bridge Investments agreed to "supply [Cryptocurrency Mining Company 1] with its power and pricing shall not exceed .04 cents per kilowatt hour and shall decrease to .035 cents per kilowatt hour within 3-4 months."

        c.      The representations and warranties included that Dubai Bridge Investments "possess the rights and authority to lease, rent, borrow and handover occupancy of Nela Park including but not limited to equipment and power sources including general property assets to any developer or tenant of any capacity."

        d.      Further, Dubai Bridge Investments "recognizes that completion of ownership and maturity of ownership deed to Nela Park will mature/complete at Q4 of 2021."

73.      On or about August 25, 2021, ZUBAIR AL ZUBAIR and MUZZAMMIL AL ZUBAIR caused Victim 2 to wire transfer $1,000,000 from a Hong Kong bank account to the Al Zubair Capital bank account ending in 9283.

74.      On or about September 27, 2021, ZUBAIR AL ZUBAIR sent a text message to Victim 2 requesting that she pay the remaining $2,000,000 due under the contract early, even though the conditions for payment in the contract had not been met: "If fact, it would be helpful if you could release the remaining 2mm [$2,000,000] to my team to help with their upgrade and operation expenses. We're doing a lot of spending and acquisitions to reach 3gw and that's important. So that would really help them. And I don't want everyone to know what I am purchasing. We will announce our power capacities together later."

75.      On or about September 29, 2021, ZUBAIR AL ZUBAIR and MUZZAMMIL AL ZUBAIR caused Victim 2 to wire transfer $2,000,000 from a Hong Kong bank account to the Al

Zubair Capital bank account ending in 9283.

76.     On or about October 25, 2021, ZUBAIR AL ZUBAIR informed Victim 2 that the large containers for cryptocurrency miners that she had paid to be shipped from Hong Kong to Nela Park could not be delivered to Nela Park because of a mercury contamination problem. ZUBAIR AL ZUBAIR sent Victim 2 a copy of a report that he claimed showed there was mercury contamination at the site. In reality, the report was about providing a permit for limited mercury discharge to Nela Park.

77.     In or around October 2021, Defendants caused Victim 2 to place the larger containers for cryptocurrency miners that she had shipped from Hong Kong into storage.

78.     In or around March 2022, ZUBAIR AL ZUBAIR caused Victim 2 to make a new agreement in which he promised that his family would provide $33,000,000 in payments to Victim 2 to fund the Nela Park cryptocurrency mining project and Victim 2 agreed to provide 1,500 miners.

79.     On or about March 16, 2022, after Victim 2 complained about problems with cryptocurrency mining in Kazakhstan, ZUBAIR AL ZUBAIR text messaged, "I know the ruling family there. They deal with my family alot in Dubai."

80.     On or about March 16, 2022, ZUBAIR AL ZUBAIR told Victim 2 by text message that she needed to send a wire transfer to his personal bank account so that they could "establish a transaction history" between their accounts before he transferred the $33,000,000 he had promised to her account.

81.     On or about March 16, 2022, ZUBAIR AL ZUBAIR caused Victim 2 to wire transfer $40,000 to his personal bank account.

82.     On or about March 22, 2022, ZUBAIR AL ZUBAIR sent a text message to

Victim 2 requesting additional wire transfers to his personal account: "I was talking to our Dubai and USA accountant. To be safe from certain government exposure we need 3 previous transactions in total between us... Totaling at least 75-80k. So you need to send 2 more transfers. Maybe 20k and another 10-15k =75k total. And then at the end of the month we wire it back to you separately. Then we send the 5-7 million in 2 separate transactions."

83.     On or about March 22, 2022, ZUBAIR AL ZUBAIR caused Victim 2 to wire transfer $15,000 to his personal bank account.

84.     On or about March 23, 2022, ZUBAIR AL ZUBAIR caused Victim 2 to wire transfer $25,000 to his personal bank account.

85.     On or about March 25, 2022, after Victim 2 saw a news article reporting that Nela Park was being sold to another company, not Dubai Bridge Investments, ZUBAIR AL ZUBAIR text messaged Victim 2 that "this was due to the mercury," and explained, "And now [the other company] will hand it over to us in April inshallah."

86.     On or about March 29, 2022, ZUBAIR AL ZUBAIR sent another text message to Victim 2 requesting additional wire transfers to his account: "I miss understood Mr. Disny-our family accountant … He's saying it's necessary that he have at least 3 transactions from your account to mine totalling 158k to 160k USD. He's saying the first payment will reach Wednesday night America time (inshallah)."

87.     On or about March 29, 2022, ZUBAIR AL ZUBAIR caused Victim 2 to wire transfer $80,000 to his personal bank account.

88.     On or about March 31, 2022, ZUBAIR AL ZUBAIR requested that Victim 2 allow him to display a large number of her cryptocurrency mining machines, which he claimed was necessary to obtain the funds promised to Victim 2. ZUBAIR AL ZUBAIR texted Victim 2:

"Can we please bring 3000 miners to East Cleveland  We should have them for some for Nela Park and another option the mayor will give me  And I want to display them and show them to the mayors and council presidents."

89.    On or about March 31, 2022, ZUBAIR AL ZUBAIR texted Victim 2: "I want 3 thousand [miners] for Nela but we will discuss something for infrastructure at mayors office I need them all there first (at city hall)."

90.    On or about March 31, 2022, ZUBAIR AL ZUBAIR texted Victim 2: "I want to show my family and mayor 3000 machines Display purposes only."

91.    On or about April 4, 2022, ZUBAIR AL ZUBAIR texted Victim 2: "A few things you need to do… Because we are telling the bank it is for our partnership with you in  mining – Bring the 3000 miners to East Cleveland (all 90TH) – mayor's office is probably better – Share me something like detailed receipt for the miners  I will need them for the remaining funds. … I think by the 11th we can have 33million [$33,000,000] in your account."

92.    On or about April 4, 2022, after Victim 2 questioned why the bank needed to approve the release of his family's money and asked to confirm that the miners were to be put on display only, ZUBAIR AL ZUBAIR texted Victim 2: "Here's what you need to know sweetheart miss [Victim 2] Firecracker  I told my family and the mayor that we will have them on display for the Ohio congress and council members until we move to Nela then we will shift them there This is why my family sent the money."

93.    On or about April 4, 2022, after Victim 2 further questioned why he needed to display 3,000 miners instead of 1,500, ZUBAIR AL ZUBAIR texted Victim 2: "They are for showing and proof to mayor and governor to give excellent support and pricing for electricity and many other supports … This is how I get 33 million to arrive … Just send the 1500 no

21

problem … And we will only show the 2000."

94.     On or about April 5, 2022, ZUBAIR AL ZUBAIR and MUZZAMMIL AL ZUBAIR sold at least 3 Antbox containers belonging to Victim 2 without Victim 2's permission.

95.     On or about April 5, 2022, ZUBAIR AL ZUBAIR and MUZZAMMIL AL ZUBAIR caused $100,000 to be wire transferred into the Dubai Bridge Investments account ending in 0302 for the sale of the Antbox containers.

96.     On or about April 11, 2022, after Victim 2 again asked to confirm if the miners were just for display, ZUBAIR AL ZUBAIR answered, "Correct … It's just to secure all the support for power expansion at Nela – mainly with government funding."

97.     On or about April 27, 2022, ZUBAIR AL ZUBAIR texted Victim 2, "We need at least 1000 [miners] to show."

98.     On or about April 27, 2022, MUZZAMMIL AL ZUBAIR took approximately 539 miners belonging to Victim 2 from a storage facility in the Northern District of Ohio.

99.     On or about May 3, 2022, ZUBAIR AL ZUBAIR and MUZZAMMIL AL ZUBAIR agreed to sell 336 of Victim 2's miners to Canadian Company 1 for $2,284,800.

100.    On or about May 4, 2022, MUZZAMMIL AL ZUBAIR took approximately 528 miners belonging to Victim 2 from a storage facility in the Northern District of Ohio.

101.    On or about May 6, 2022, ZUBAIR AL ZUBAIR and MUZZAMMIL AL ZUBAIR caused Canadian Company 1 to wire transfer $2,284,780 to the Dubai Bridge Investments account ending in 0302.

102.    On or about May 18, 2022, ZUBAIR AL ZUBAIR and MUZZAMMIL AL ZUBAIR agreed to sell 723 of Victim 2's miners to Canadian Company 1 for $3,890,000.

103.    On or about May 26, 2022, ZUBAIR AL ZUBAIR and MUZZAMMIL AL

ZUBAIR caused Canadian Company 1 to wire transfer $3,889,980 to the Dubai Bridge Investments account ending in 0302.

104.    On or about June 9, 2022, Victim 2 asked ZUBAIR AL ZUBAIR about Antbox containers that she had discovered were missing. Although ZUBAIR AL ZUBAIR had previously sold the Antbox containers, he falsely responded, "They are in the power testing site I told. You last night With jobs ohio."

105.    On or about July 3, 2022, after Victim 2 again asked about the status of the machines that were taken for display, ZUBAIR AL ZUBAIR falsely claimed that he was paying her for the machines, texting her: "Especially when my family is still sending you money for the machines."

106.    On or about August 2, 2022, after Victim 2 again asked about the status of the cryptocurrency miners that ZUBAIR AL ZUBAIR and MUZZAMMIL AL ZUBAIR took from her, ZUBAIR AL ZUBAIR responded by claiming that Victim 2 was supposed to have provided him with 3,000 cryptocurrency miners and containers, but that he "only took a few [cryptocurrency miners] for demonstration and to show my family you were serious."

### *Commercial Property Lease Scheme*

107.    On or about February 14, 2022, MUZZAMMIL AL ZUBAIR altered and caused to be altered a TD Ameritrade statement for Al Zubair Capital to falsely show an inflated account balance.

108.    On or about February 14, 2022, Defendants caused a Dubai Bridge Investments employee to send a TD Ameritrade statement for Al Zubair Capital that had been altered and caused to be altered by MUZZAMMIL AL ZUBAIR to falsely inflate the account balance to Realtor 1.

109.    On or about February 15, 2022, ZUBAIR AL ZUBAIR caused Realtor 1 to send the altered TD Ameritrade account statement to Victim Company 1.

***Residential Property Lease Scheme***

110.    On or about March 13, 2022, MUZZAMMIL AL ZUBAIR altered and caused to be altered a JP Morgan Chase Deposit Account Balance Summary statement dated March 10, 2022, for the Al Zubair Capital bank account to falsely show that the account had more funds in it than it really had.

111.    On or about March 13, 2022, ZUBAIR AL ZUBAIR sent a text message to Realtor 1 with the altered JP Morgan Chase Deposit Account Balance Summary statement dated March 10, 2022, for the Al Zubair Capital account.

112.    On or about March 13, 2022, ZUBAIR AL ZUBAIR caused Realtor 1 to send the altered JP Morgan Chase Deposit Account Balance Summary statement to Victim 3.

All in violation of Title 18, United States Code, Section 1349.

COUNTS 2-15
(Wire Fraud, 18 U.S.C. §§ 1343 and 2)

The Grand Jury further charges:

113.    Paragraphs 1 through 20 and 24 through 112 of the Indictment are re-alleged and incorporated by reference as if fully set forth herein.

114.    From in or around June 2020 to in or around August 2023, Defendants ZUBAIR MEHMET ABDUR RAZZAQ AL ZUBAIR, aka ZUBAIR MEHMET ABDUR RAZZAQ, and MUZZAMMIL MUHAMMAD AL ZUBAIR, aka MUZZAMMIL IBN MUHAMMAD, together with others known and unknown to the Grand Jury, devised and intended to devise schemes and artifices to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

24

115.    On or about the dates listed below, each transmission a separate and distinct count, in the Northern District of Ohio and elsewhere, Defendants ZUBAIR AL ZUBAIR and MUZZAMMIL AL ZUBAIR, for the purpose of executing the schemes listed below and described above, and attempting to do so, knowingly transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce the following writings, signs, signals, picture and sounds:

| Count | Approx. Date | Scheme | Description of Wire Communication |
|---|---|---|---|
| 2 | April 12, 2021 | U.A.E. Investment Fraud Scheme described in Paragraphs 36-37 | Wire transfer of $450,000 from Victim 1 in the U.A.E. to Al Zubair Capital account ending in 9283 in Ohio described in Paragraph 55 |
| 3 | February 19, 2021 | SBA EIDL Scheme described in Paragraphs 38-39 | Online application for EIDL submitted electronically from Ohio to SBA servers in Iowa described in Paragraph 59 |
| 4 | March 9, 2021 | SBA EIDL Scheme described in Paragraphs 38-39 | ACH deposit from SBA through servers outside of Ohio to Dubai Bridge Investments account ending in 2216 in Ohio described in Paragraph 61 |
| 5 | July 23, 2021 | Nela Park Cryptocurrency Mining Scheme described in Paragraphs 40-43 | Text message from ZUBAIR AL ZUBAIR in Ohio to Victim 2 outside Ohio regarding Nela Park that referred to it as "the property we currently control" described in Paragraph 63 |
| 6 | July 25, 2021 | Nela Park Cryptocurrency Mining Scheme described in Paragraphs 40-43 | Email from ZUBAIR AL ZUBAIR in Ohio to Victim 2 that referred to "30+ buildings under our control and this industrial park" described in Paragraph 65 that traveled through servers outside Ohio |
| 7 | August 5, 2021 | Nela Park Cryptocurrency Mining Scheme described in Paragraphs 40-43 | Email from ZUBAIR AL ZUBAIR to Victim 2 in Ohio with chart that claimed electrical power at $0.04 per kilowatt/hour or less described in Paragraph 68 that traveled through servers outside Ohio |

| Count | Approx. Date | Scheme | Description of Wire Communication |
|---|---|---|---|
| 8 | August 10, 2021 | Nela Park Cryptocurrency Mining Scheme described in Paragraphs 40-43 | Email from MUZZAMMIL AL ZUBAIR to Victim 2 in Ohio with a proposed contract described in Paragraph 69 that traveled through servers outside Ohio |
| 9 | August 25, 2021 | Nela Park Cryptocurrency Mining Scheme described in Paragraphs 40-43 | Wire transfer of $1,000,000 from Victim 2 from bank account in Hong Kong to Al Zubair Capital account ending in 9283 in Ohio described in Paragraph 73 |
| 10 | September 29, 2021 | Nela Park Cryptocurrency Mining Scheme described in Paragraphs 40-43 | Wire transfer of $2,000,000 from Victim 2 from bank account in Hong Kong to Al Zubair Capital account ending in 9283 in Ohio described in Paragraph 75 |
| 11 | May 6, 2022 | Nela Park Cryptocurrency Mining Scheme described in Paragraphs 40-43 | Wire transfer of $2,284,780 from Canadian Company 1 in Canada to Dubai Bridge Investments account ending in 0302 in Ohio described in Paragraph 101 |
| 12 | May 26, 2022 | Nela Park Cryptocurrency Mining Scheme described in Paragraphs 40-43 | Wire transfer of $3,889,980 from Canadian Company 1 in Canada to Dubai Bridge Investments account ending in 0302 in Ohio described in Paragraph 103 |
| 13 | July 3, 2022 | Nela Park Cryptocurrency Mining Scheme described in Paragraphs 40-43 | Text message from ZUBAIR AL ZUBAIR outside of Ohio to Victim 2 in Ohio with false claim that "my family is still sending you money for the machines" described in Paragraph 105 |
| 14 | February 15, 2022 | Commercial Property Lease Scheme described in Paragraph 44 | Email from Realtor 1 in Ohio to Victim Company 1 with altered TD Ameritrade statement describe in Paragraph 109 that traveled through servers outside Ohio |
| 15 | March 13, 2022 | Residential Property Lease Scheme described in Paragraph 45 | Text message from Realtor 1 in Ohio to Victim 3 outside United States with altered JP Morgan Chase Deposit Account Balance Summary statement described in Paragraph 112 |

All in violation of Title 18, United States Code, Sections 1343 and 2.

<u>COUNT 16</u>
(Conspiracy to Commit Money Laundering, 18 U.S.C. § 1956(h))

The Grand Jury further charges:

116.     Paragraphs 1 through 20 and 24 through 112 of the Indictment are re-alleged and incorporated by reference as if fully set forth herein.

117.     From in or around June 2020 to in or around August 2023, in the Northern District of Ohio, Eastern Division and elsewhere, Defendants ZUBAIR MEHMET ABDUR RAZZAQ AL ZUBAIR, aka ZUBAIR MEHMET ABDUR RAZZAQ, and MUZZAMMIL MUHAMMAD AL ZUBAIR, aka MUZZAMMIL IBN MUHAMMAD, and others known and unknown to the Grand Jury, did knowingly combine, conspire, confederate, and agree to commit offenses against the United States in violation of Title 18, United States Code, Sections 1956 and 1957, to wit: (a) to knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that is, conspiracy to commit wire fraud and wire fraud as alleged in Counts 1 through 15, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and (b) to knowingly engage and attempt to engage, in monetary transactions by, through or to financial institutions, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from specified unlawful activity, that is, conspiracy to commit wire fraud and wire fraud as alleged in Counts 1 through 15, in violation of Title 18, United States Code, Section 1957.

## Manner and Means of the Conspiracy

It was part of the conspiracy that:

118. Defendants established multiple bank accounts for Dubai Bridge Investments, a bank account for Al Zubair Capital, a TD Ameritrade account for Al Zubair Capital, and personal bank accounts.

119. After receiving proceeds from the schemes described in Count 1, Defendants transferred the proceeds among and back and forth between different accounts using checks, cash withdrawals and deposits, and wire transfers.

120. After conducting financial transactions moving proceeds among these accounts, Defendants spent the proceeds to their own benefit.

121. Defendants engaged in multiple monetary transactions by, through, and to financial institutions, affecting interstate and foreign commerce, involving proceeds from the schemes described in Count 1, of a value greater than $10,000.00, including making large cash withdrawals and spending on luxury vehicles, travel on private jets, luxury travel, lavish hotel stays, entertainment, shopping, jewelry, firearms, and other luxury items.

All in violation of Title 18, United States Code, Section 1956(h).

### Counts 17-20
(Money Laundering, 18 U.S.C. §§ 1957 and 2)

The Grand Jury further charges:

122. Paragraphs 1 through 20 and 24 through 112 of the Indictment are re-alleged and incorporated by reference as if fully set forth herein.

123. On or about the dates set forth below, in the Northern District of Ohio, Eastern Division and elsewhere, Defendants ZUBAIR MEHMET ABDUR RAZZAQ AL ZUBAIR, aka

ZUBAIR MEHMET ABDUR RAZZAQ, and MUZZAMMIL MUHAMMAD AL ZUBAIR, aka

MUZZAMMIL IBN MUHAMMAD, knowingly engaged and attempted to engage in the

following monetary transactions by, through, and to a financial institution, affecting interstate

and foreign commerce, in criminally derived property of a value greater than $10,000.00, that is,

wire transfers of funds, such property have been derived from a specified unlawful activity that

is, conspiracy to commit wire fraud and wire fraud, as alleged in Counts 1 through 16 of this

Indictment, each transaction constituting a separate offense:

| Count | Date | Monetary Transaction | Amount |
|-------|------|----------------------|--------|
| 17 | January 7, 2022 | Wire transfer from Al Zubair Capital account ending in 9283 to firearms dealer for purchase of security equipment | $15,035 |
| 18 | May 20, 2022 | Debit Card purchase at Saks Fifth Avenue from Dubai Bridge Investments account ending in 0302 | $11,540.88 |
| 19 | June 7, 2022 | Debit Card purchase at Honda of Cleveland Heights from Dubai Bridge Investments account ending in 0302 | $19,745.92 |
| 20 | August 24, 2022 | Wire transfer from Dubai Bridge Investments account ending in 0302 to Cleveland Browns for luxury suite | $83,500 |

All in violation of Title 18, United States Code, Sections 1957 and 2.

Count 21
(Theft of Government Funds, 18 U.S.C. §§ 641 and 2)

The Grand Jury further charges:

124.    Paragraphs 1 through 20 and 24 through 112 of the Indictment are re-alleged and

incorporated by reference as if fully set forth herein.

125.    On or about March 9, 2021, in the Northern District of Ohio, Eastern Division,

and elsewhere, Defendants ZUBAIR MEHMET ABDUR RAZZAQ AL ZUBAIR, aka ZUBAIR

MEHMET ABDUR RAZZAQ, and MUZZAMMIL MUHAMMAD AL ZUBAIR, aka

MUZZAMMIL IBN MUHAMMAD knowing and willfully embezzled, stole, purloined, and converted to their own use money of the United States or any department or agency thereof, of a value exceeding $1,000, to wit: $27,400 in SBA EIDL funds obtained by fraud.

All in violation of Title 18, United States Code, Sections 641 and 2.

## Count 22
(Harboring a Fugitive, 18 U.S.C. § 1071)

The Grand Jury further charges:

126.    On or about February 23, 2023, a Grand Jury in the Northern District of Ohio returned an indictment charging Kelvin Bedell with Possession with Intent to Distribute a Controlled Substance and Money Laundering Conspiracy.  On or about February 23, 2023, a warrant was issued for Bedell's arrest on the indictment.

127.    On or about June 24, 2023, ZUBAIR AL ZUBAIR received and read a text message with a link to a news story that described Bedell as a fugitive wanted by the United States Marshal's Service.  After receiving this message, ZUBAIR AL ZUBAIR provided Bedell with transportation and allowed him to stay at his residence.

128.    Between on or about June 24, 2023, and on or about August 8, 2023, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant ZUBAIR MEHMET ABDUR RAZZAQ AL ZUBAIR, aka ZUBAIR MEHMET ABDUR RAZZAQ, harbored and concealed Kelvin Bedell, a person for whose arrest a warrant and process had been issued under the provisions of a law of the United States, so as to prevent the discovery and arrest of Kelvin Bedell, after notice and knowledge of the fact that a warrant and process had been issued for the apprehension of Kelvin Bedell, and which warrant had been issued on a felony charge.

All in violation of Title 18, United States Code, Section 1071.

## FORFEITURE

The Grand Jury further alleges:

129.   The allegations of Counts 1 through 21 are hereby realleged and incorporated herein by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Sections 981(a)(1)(C), 982(a)(1), and 28 U.S.C. § 2461(c).  As a result of the foregoing offenses, Defendants ZUBAIR AL ZUBAIR and MUZZAMMIL AL ZUBAIR, shall forfeit to the United States all property, constituting or derived from proceeds traceable to the violations charged in Counts 1, 2-15 and 21; and all property involved in the violations charged in Counts 16 and 17-20, or any property traceable to such property; including, but not limited to, the following:

A.   The following 52 Firearms seized from ZUBAIR AL ZUBAIR:

1.   FNH USA LLC 509 9mm caliber pistol SN: GKS0228505;
2.   Zastava Z-PAP M70 7.62 caliber rifle SN: Z70-103677;
3.   Romarm/CUGIR (Century International Arms) Micro Draco 7.62 caliber pistol SN: 22PMD-31131;
4.   Masterpiece Arms Defender 9mm caliber pistol SN: FX35630;
5.   Sig-Sauer P320 9mm caliber pistol SN: 58J059218;
6.   Pioneer Arms Corporation Hellpup 7.62 caliber pistol SN: PAC1170186;
7.   Sig-Sauer P320 9mm caliber pistol with empty magazine SN: 58B196797;
8.   Steyr M9-A2 9mm caliber pistol SN: 3215917;
9.   Zastava PAP M92 PV 7.62 caliber Rifle with empty magazine contained in gun case. SN: M92PV013546;
10.   FNH USA LLC 509 9mm caliber Pistol contained in gun case SN: GKS0141575;
11.   Walther CCP 9mm caliber Pistol SN: FDF0399;
12.   SCCY Industries LLC CPX-2 9mm caliber Pistol SN: C182860;
13.   Springfield Armory 1911 A1 .45 caliber Pistol SN: NM91000;
14.   Springfield Armory/HS Produkt XDM Elite 9mm caliber Pistol SN: BA348769;
15.   Shadow Systems LLC DR920 9mm caliber Pistol SN: SSX005434;
16.   CZ USA CZ P-10F 9mm caliber Pistol with magazine SN: UB18877;
17.   Kimber Ultra Raptor II .45 ACP caliber Pistol SN: KU74646;
18.   Smith & Wesson SW1911PC .45 caliber Pistol SN: UFD9781;
19.   FNH USA LLC 509 LS EDGE 9mm caliber Pistol with empty magazine SN: GKS0193320;

20.     CZ CZ75 SP-01 9mm caliber Pistol SN: FD360785;
21.     Kimber Micro 9 Raptor 9mm caliber Pistol SN: TB0044209;
22.     Ruger SP101 .357 Magnum caliber Revolver SN: 578-33522;
23.     Smith & Wesson SW1911PC .45 caliber Pistol SN: UFE0349;
24.     Colt Government .45 caliber Pistol SN: 08407EGA;
25.     Canik 55 TP-9SFX 9mm caliber Pistol SN: 21BC72871;
26.     Zastava ZPA P92 7.62 caliber Pistol SN: ZPA P92;
27.     Keltec, CNC Industries PLR-22 .22 caliber Pistol SN: U1P26;
28.     Ruger Mini 14 Ranch.223 caliber Rifle SN: 581-88840;
29.     Keltec, CNC Industries CMR-30 .22 caliber Rifle SN: Y5K59;
30.     S.C. Nova Grup S.R.L. Draco NAK9 9 caliber Pistol SN: RON2164830;
31.     Remington Arms Company, Inc. 870 12-gauge Shotgun SN: RAF014506;
32.     F.N. (FN HERSTAL) PS90 5.7 caliber Rifle SN: FN142005;
33.     Sig-Sauer (Sig Arms) MPX Multi caliber Pistol SN: 62F020735;
34.     Keltec CNC Industries KS7 12-gauge shotgun SN: QE987;
35.     Sharps Bros Mfg. The Jack Stripped Lower Receiver MULTI Caliber SN: A24925;
36.     ZEV Technologies Inc. ZEV-FL AR15 Forged Lower Receiver SN: ZEV-FL;
37.     Steyr Arms Inc. AUG/A3 M1 5.56 caliber Rifle SN: 21USA658;
38.     Great Lakes Firearms GL-15 MULTI caliber Rifle SN: 1051.7100;
39.     Thompson M1 Carbine .45 caliber Rifle SN: KC9008;
40.     Sig Sauer SIG MCX 7.62 caliber Rifle SN: 63J013511;
41.     Springfield Armory Saint Multi caliber Rifle SN: ST401403;
42.     Century Arms International VSKA 7.62 caliber Rifle SN: SV7077955;
43.     Unique AR's McCall ID Multi caliber Rifle SN: UAR211594;
44.     Sig Sauer lower pistol frame (no serial number);
45.     Keltec CNC Industries PMR-30 .22 caliber Pistol SN: WVQ49;
46.     Glock G-26 GEN5 9mm caliber Pistol SN: AHBF862;
47.     Savage Stance 9mm caliber Pistol SN: AA04466;
48.     CZ CZ75 P-01 9mm caliber Pistol SN: D344459;
49.     Ruger PC Charger 9mm caliber Pistol SN: 913-40969;
50.     Springfield Armory HS Produkt Hellion 5.56 caliber Rifle SN: BBS14275;
51.     Akkurt Silah San Garaysar Fear-114 12-gauge Shotgun SN: 21A-004048; and
52.     Action Arms LTD. (Israel Weapon Ind.) UZI B 9mm caliber SubMachine Gun SN: SA63334.

B.     The following 27 pieces of Miscellaneous Jewelry seized on August 8, 2023,

seized from ZUBAIR AL ZUBAIR:

1.     Richard Mille Watch SN: RM11-03RG/003;
2.     Richard Mille Watch SN: RM11-03CAFQ/2816;
3.     Richard Mille SN: RM11AORG-ATZ/1168;

4.     Richard Mille Watch SN: RM11-03CA-FQ104/200;
5.     Richard Mille Watch SN: RM011AGTI/6688;
6.     Richard Mille Watch no glass front SN: RM35-02FQ/028;
7.     Richard Mille Watch SN: RM011AORG-ATZ/6698;
8.     Richard Mille Watch SN: RM56-01ANSAPHR;
9.     Richard Mille Watch SN: RM53-01CAPR02;
10.    Richard Mille Watch SN: RM67-02FQ002;
11.    Richard Mille Watch SN: RM027AKCA3450;
12.    Richard Mille Watch Ralph Nadal Edition white SN: RM61-01-AN-CATZP/001;
13.    Richard Mille Watch gray band; black dial w/ no glass SN: unknown;
14.    Richard Mille Watch SN: RM11-03MCLCA-FQMCL02;
15.    Richard Mille Watch red band; white dial  SN: unknown;
16.    Richard Mille Watch SN: RM11-03RG-003;
17.    Rolex Watch SN: CL572200;
18.    Rolex Watch Model 5LX SN: unknown;
19.    Rolex Watch blue face; red dial SN: unknown;
20.    Rolex Watch white face; blue dial; band and face separate SN: unknown;
21.    Rolex Watch Red and Blue Dial model ST9 SN: unknown;
22.    Audemars Piguet Watch SN: F54328;
23.    Audemars Piguet Watch SN: J26837;
24.    Patek Philippe Watch SN: A384EAP;
25.    Audemars Piguet Watch SN: H57528;
26.    Patek Philippe Watch with Leather Band no SN; and
27.    Pateck Philippe Watch SN: A384FBP;

C.     The following 31 miscellaneous firearms seized on August 8, 2023, from

MUZZAMMIL AL ZUBAIR:

1.     Keltec Industries P50 5.7 caliber pistol SN: AADF49;
2.     Colt King Cobra .357 caliber Revolver SN: RA255302;
3.     FNH USA LLC, model 509 9mm caliber pistol SN: GKS0255570;
4.     Sig Sauer P320 9mm caliber pistol SN: 58H275147;
5.     Kimber model K6S .357 caliber Revolver SN: RV091201;
6.     Glock G-19 GEN4 9mm caliber pistol SN: BUYG094;
7.     Keltec Industries model PMR-30 .22 caliber pistol SN: WWPJ64;
8.     Glock model G-17L 9mm caliber pistol with receiver 20/20 stabilizer kit SN: BFSB910;
9.     Beretta Pietro 92x 9mm caliber pistol SN: BST20974;
10.    CZ CZ75 SP-01 9mm caliber pistol SN: F307720;
11.    Century Arms Draco NAK-9 9mm caliber pistol SN: RON2161137;
12.    CZ model CZ P-07 9mm caliber pistol SN: A894068;
13.    Glock G-43X 9mm caliber pistol SN: BXCD815;
14.    Glock G-26 GEN5 9mm caliber pistol SN: AHAH764;
15.    Glock G-20 10mm caliber pistol SN: BWTH141;

16. Glock G-45 9mm caliber pistol SN: BUFC635;
17. Glock G-31 GEN4 .357 caliber pistol SN: BVYE675;
18. Ruger LCP .380 caliber pistol SN: 379003534;
19. Charter Arms Santa Fe Sky .38 Special caliber Revolver SN: 22L28253;
20. Romarm/Cuigar Micro Draco 7.62 caliber rifle SN: 21PMD-26508;
21. Taurus PT111 Millennium G2 9mm caliber pistol SN: TKO91746;
22. Kimber Micro 9 Special Edition 9mm caliber pistol SN: PB0397812;
23. Spike's Tactical LLC ST15 multi-caliber Rifle SN: NSL162425;
24. Glock G19X 9mm caliber pistol SN: BWSV135;
25. Glock G-26 9mm caliber pistol SN: BWEG829;
26. Ruger PC Charger 9mm caliber pistol SN: 913-09675;
27. Century Arms International BFT47 7.62 caliber rifle SN:BFT47012283;
28. Mossberg 590 12-gauge shotgun SN: V1345375;
29. Sig Sauer MPX Multi caliber rifle SN: 62F016679;
30. CZ Scorpion EVO 3 S1 9mm caliber pistol SN: E043468;
31. Brigade Manufacturing Inc BM-F-9 multi caliber pistol SN: 34137F;

D.     The following 12 pieces of miscellaneous jewelry seized on August 8, 2023,

form MUZZAMMIL AL ZUBAIR:

1. Black Richard Mille Watch SN: unknown;
2. Black Richard Mille Watch SN: unknown;
3. White Richard Mille Watch SN: unknown;
4. Silver Colored Audemars Piguet Watch SN: unknown;
5. Clear Hublot Watch SN: unknown;
6. Black Clear Stone Encrusted Audemars Piguet Watch SN: unknown;
7. Blue Patek Phillippe Watch SN: unknown;
8. Black face, black band Royal Oak Watch SN: H57475;
9. Brown face/Silver colored brown bad, Royal Oak Watch SN: F54328;
10. Black face Rolex silver colored band watch SN: unknown;
11. White Face Silver colored Patek Phillippe Watch SN: unknown;
12. Blue face/silver colored black leather band Patek Phillippe watch SN: unknown;

E.     2022 Mercedes-Benz, S 580 4matic, VIN: W1K6G7GB1NA110925, seized from

MUZZAMMIL AL ZUBAIR; and

F.      2021 Indian Scout Bobber Sixty Motorcycle, VIN: 56KMTB118M3173002, seized from MUZZAMMIL AL ZUBAIR.

A TRUE BILL.

Original document - Signatures on file with the Clerk of Courts, pursuant to the E-Government Act of 2002.